JOHN LEECH v. THE STATE.

No. 1071. Decided June 21, 1911.

Rehearing denied October 18, 1911.

**1.—Murder—Grand Jury—Indictment.**

Where appellant did not claim or show that he would or could have successfully challenged either the array or any of the grand jurors participating in the consideration or return of the indictment against him, or that he was injured by the fact that the grand jury was excused by the court for a week or such matter before the indictment was found and that only ten of them returned the bill, there was no reversible error.

**2.—Same—Evidence—Threats.**

Upon trial of murder, there was no error in admitting evidence of threats made by the defendant some three and one-half years previous to the killing, but which had been continued from time to time until shortly before the homicide.

**3.—Same—Argument of Counsel.**

Where, upon trial of murder, State's counsel traveled outside of the record in his argument to the jury, but the court immediately reprimanded such conduct of counsel, and thereupon offered to withdraw the objectionable argument from

the jury, but counsel for the defendant stated to the court that they did not desire a written charge on this matter, there was no reversible error.

**4.—Same—Charge of Court—Express Malice.**

Where, upon trial of murder, the court in his charge taken as a whole properly submitted the issue of murder in the first degree, and the objection thereto was of a general character, there was no reversible error.

**5.—Same—Charge of Court—Article 723.**

Where, upon trial of murder, the court submitted every issue raised by the evidence by proper charge, there was no error in refusing special instructions, and under Article 723 of the Code of Criminal Procedure, there was no reversible error.

Appeal from the District Court of El Paso.    Tried below before the Hon. James R. Harper.

Appeal from a conviction of murder in the first degree; penalty, imprisonment for life in the penitentiary.

The opinion states the case.

*J. C. Wharton & P. E. Gardner,* for appellant.—On the question of admitting threats as too remote: People v. Hyndnan, 99 Cal., 1; State v. Barnwell, 80 N. C., 466; State v. Johnson, 64 Am. Dec., 582; State v. Hill, 34 Am. Dec., 396; 1 McClain Criminal Law, Sec. 420.

On the question of argument of counsel: Tillery v. State, 5 S. W. Rep., 842; Bice v. State, 38 S. W. Rep., 803; Attaway v. State, 41 Texas Crim. Rep., 395, 55 S. W. Rep., 45; Butler v. State, 27 S. W. Rep., 128; Seals v. State, 38 S. W. Rep., 1006; Fuller v. State, 30 Texas Crim. App. 559.    Upon question of express malice:    Benson v. State, 44 S. W. Rep., 168; Williams v. State, 3 Texas Crim. App., 316; Green v. State, 32 Texas Crim. Rep., 298; Tippet v. State, 37 Texas Crim. Rep., 186.

*C. E. Lane,* Assistant Attorney-General for the State, cited cases in opinion.

PRENDERGAST, JUDGE.—On June 17, 1910, the appellant was indicted by the grand jury of El Paso County for the murder of E. Kohlberg on that day by shooting him with a pistol.    He was convicted of murder in the first degree and a life penalty in the penitentiary was assessed against him.

The appellant, by his attorneys, has filed a brief in the case and also orally argued the case when it was submitted.    The material questions are presented by the appellant's brief and while we have considered all other grounds of the motion for new trial, we will only discuss those presented by the brief as it is unnecessary to discuss any of the others.

The killing is shown to have occurred just before or about 5 o'clock in the evening of June 17, 1910.    The District Court was

then in session with a properly organized and empaneled grand jury, and had been for some time. On June 17th, by permission of the court, the grand jury adjourned until June 24, 1910. Very soon after the killing, on the same day, by order of the court, the grand jury was reassembled at 8 o'clock that evening. It seems that only ten of the twelve grand jurors could be reached and were present when the case was investigated and considered by the grand jury and the indictment was found. At the time the indictment was returned into open court on said date, by order of the court, the clerk polled the jury, when ten of them answered present and reported to the court that they concurred in finding the bill, which was thereupon ordered to be received and filed by the clerk, and this was done. On June 24, 1910, the appellant filed a motion to set aside the indictment against him for the reason that he was given no opportunity to challenge the array of the grand jury or the personnel thereof prior ·to the time the indictment was returned; that the grand jury was re-convened on the day of the killing and after the killing, without the knowledge of the defendant and the indictment was returned against him while he was in jail without counsel and without the means or opportunity of securing the same, and defendant was given no opportunity to raise any objection to the qualification or the legality of the grand jury; and because the grand jury had on the morning of June 17, 1910, adjourned until the 24th of that month; that some of the members of the grand jury were not notified of such call and had no opportunity to be present at the deliberations and that the indictment was returned by only ten grand jurors and that the indictment was brought about at the instigation of a combination of influential persons and was not the result of calm deliberation. This motion by the appellant to set aside the indictment was contested by the State as being wholly insufficient and presenting no reasons why the indictment should be set aside; and further showed that on May 2, 1910, the grand jury for that term of court had been duly and properly summoned, empaneled and sworn as the grand jury for that term of the court; that the grand jury thereafter convened from time to time and date to date under a proper order of the court, and on June 17, 1910, met and held a legal meeting and by permission of the court were permitted to adjourn until June 24th following; that on that date, June 17, 1910, the said court and the judge thereof made and entered an order in the minutes of the court re-convening the grand jury on that date at 8 o'clock p. m.; that ten of the grand jurors were present at the investigation of the charge against the appellant and that after due deliberation and hearing of the testimony the indictment was returned into open court, when and where the grand jurors were polled and it was shown that ten were present and participated in said deliberations and that as many as nine concurred in the finding of the indictment. It is also expressly denied

that the indictment was brought about at the instigation of a combination of influential persons, but that it was the result of calm deliberation. This contest by the State was supported by the undisputed affidavit of the foreman of the grand jury.

Article 397, Code Crim. Procedure, provides: "Any person, before the grand jury has been impaneled, may challenge the array of jurors or any person presented as a grand juror, and in no other way shall objections to the qualifications and legality of the grand jury be heard. Any person confined in jail in the county shall, upon his request, be brought into court to make such challenge."

Art. 400, Code Crim. Procedure, provides: "A challenge to the array shall be made in writing, and for these causes only: 1. That the persons summoned as grand jurors are not, in fact, the persons selected by the jury commissioners. 2. In case of grand jurors summoned by order of the court, that the officer who summoned them had acted corruptly in summoning any one or more of them."

Article 401, Code Criminal Procedure, provides: "A challenge to a particular grand juror may be made orally, and for the following causes only: 1. That he is not a qualified grand juror. 2. That he is the prosecutor upon an accusation against the person making the challenge. 3. That he is related by consanguinity or affinity to some person who has been held to bail, or who is in confinement upon a criminal accusation."

Article 410, Code Criminal Procedure, provides: "Nine members shall be a quorum for the purpose of discharging any duty or exercising any right properly belonging to the grand jury."

Article 419, Code Criminal Procedure, provides: "The grand jury shall meet and adjourn at times agreed upon by a majority of the body, but they shall not adjourn at any one time for more than three days, unless by consent of the court; but with the consent of the court, they may adjourn for a longer time, and shall, as near as may be, conform their adjournments to those of the court."

Article 411, Code Criminal Procedure, provides: "When a grand jury has been discharged by the court for the term, it may be reassembled by the court at any time during the term, and in case of a failure of one or more of the members to reassemble, the court may complete the panel by impaneling other qualified persons in their stead, in accordance with the rules prescribed in this chapter for completing the grand jury in the first instance."

The above, we think, are the only statutory provisions applicable to the question here raised. The appellant does not show anywhere, or claim that he would or could have successfully challenged either the array or any of the grand jurors participating in the consideration or return of the indictment against him. Neither does he claim to have been in any way injured by the matter of haste in his indictment. He does not claim that any of the grand jurors were disqualified for any

reason. It is our opinion that the grand jury, which did indict appellant, was the legally constituted grand jury of the District Court of El Paso County, at the time of the indictment; that the court and the judge thereof had the power and authority to reassemble or reconvene the grand jury at the time it did and as no injury whatever is shown to the appellant, the court did not err in not setting aside the indictment. In this connection, it might be well to state that the case was not tried at that term of the court, but was continued at the suggestion of the appellant to the next term of the court, and that his trial was not begun until October 3, 1910. No authority is cited by appellant in his brief or oral argument to sustain his motion to set aside the indictment.

It is not necessary to recite in full the evidence in this case. We will only give a brief summary of it so as to more clearly bring out the questions discussed and decided.

The deceased, Kohlberg, some seven years before the killing, rented to appellant, a hotel belonging to the deceased. It seems that no trouble arose between them about the payment of the rents until February or March, 1907; at least, if any trouble arose before then, the evidence does not disclose it. The deceased, himself, did not collect his rents, but had rental and collecting agents to do so for him. In February or March, 1907, the appellant got behind in the payment of his rents for the hotel. Deceased's agents thereupon began to press him for payment, repeatedly presenting bills for the payment of the back rent. The collecting agents for the deceased was a firm known as Stevens Brothers. They had various bookkeepers and collectors whom they sent out to collect rents and also from the appellant. Among other agents whom they sent for the collection of the rent was one A. R. Coleman. Coleman went to see the appellant with a list of these back rents and demanded payment. Appellant objected to it and they had considerable argument thereabout at the time. This was in February or March, 1907. Coleman made a second trip to the appellant and presented the bill and told appellant that deceased had ordered him, appellant, to be put out if he did not pay his rent. The appellant replied, "If he does, I will kill the damn Jew." It seems that from that time on there was more or less trouble with the appellant in the collection and attempted collection of the rents due the deceased for the hotel.

Again in April, 1909, Chas. B. Stevens, one of the firm of Stevens Brothers, after repeated efforts to collect the rents, told the appellant that the rents continued to go behind and if they continued, they would be obliged to take steps to put him out and he then told this witness that if anything was done to put him out of that house he would go up here and kill Mr. Kohlberg over it. Again in April, 1910, this same witness, Stevens, was trying to collect the back rents from him, and in substance, the same conversation occurred and the same threat was

made by the appellant to this witness at that time. The witness remarked to him, "John, you know you wouldn't do anything of that kind," and he replied, "Yes, I would, so help me God." Again on June 17, 1910, this same witness was endeavoring to collect from him, rents for the hotel which, at that time, were claimed by Stevens Brothers for the deceased, to amount to $1150. The appellant disputed the amount of the claimed rents, claiming that it was about $200 less than $1150, and the appellant then claimed that the deceased was attempting to rob him. Stevens Brothers, failing to get the payment of any rent from him, appellant claiming that he could not pay it, placed the matter in the hands of an attorney, Mr. R. C. Walshe, for collection. Mr. Walshe, thereupon, saw the appellant and presented the account to him and told him he was there to collect it or to see what he could do about it. The appellant said he could not do anything then and the attorney told him he would have to pay the rent and that he would also have to give up possession of the premises and that he would sue him for the rent. Appellant thereupon made no reply, except, "Well," and turned and walked off. At this time, before they separated, the appellant claimed that one item, the rent for the last month, $150, was not due, but the attorney told him he wanted to know if he could pay anything and that the difference could be fixed up later. He made no reply to that, but just turned around and walked off. This occurred about 3 o'clock p. m., June 17, 1910. The attorney at once went to his office and prepared and gave to the constable for service, a notice dated that day and addressed to the appellant, wherein he notified him that the lease theretofore existing between E. Kohlberg and appellant, dated June 8, 1908, for five years, on the hotel property, identified and described, "is this day, hereby terminated for nonpayment of the rent, and you are further hereby notified to immediately vacate and deliver to me the possession of the above described premises; and you are further hereby notified not to remove any of the goods, wares, or furniture from said premises, as I have and hold an express landlord's lien on the same to secure the payment of the rent due and to become due. E. Kohlberg, by R. C. Walshe, Attorney & Agent." The constable served this notice upon the appellant by handing him the original thereof in writing at about 4:15 o'clock p. m. on June 17, 1910. At this time, the appellant was in his shirt sleeves. He claims that he showed the notice and read it to his wife at once; that after some conversation with her, he then left the hotel where he was when the notice was served upon him, and claims to have gone to the office of his attorneys in El Paso, but not finding them, he thereupon went down upon the street and, either in going down from the office of his attorneys to the street or just after he got on the street, he casually met a party, who claimed to have been in Mexico, and this party delivered to him a double action pistol belonging to the appellant, which he claimed to have loaned to another

party some months before, who was going to Mexico. The party then delivering the pistol to him told him that the party to whom he had loaned the pistol had sent it to him by this party. Whether the jury believed the appellant's statement and that of his witness, or whether or not he then and there got this pistol, or whether he armed himself with the pistol when he first left the hotel, we have no way of determining. The circumstances would justify the jury in believing that he armed himself before he left the hotel. At any rate, he, just before 5 o'clock p. m., on June 17, went to the store of the deceased. The deceased kept a cigar store. He manufactured cigars and also sold them at wholesale and retail. In the deceased's store, at the time the appellant reached there, only three persons were therein; the deceased and his grown son and the bookkeeper. The bookkeeper was behind the railing at work on his books, and did not notice and did not hear anything that passed between the appellant and the deceased at that time until the first shot was fired. When the appellant went into the store of the deceased, the deceased's son, Walter Kohlberg, was therein, standing a few feet from the entrance. The deceased was sitting in a chair in an alcove in the store, reading a newspaper. Walter then stepped a few feet toward the entrance and stood there. The appellant went in and sat down, in a cool and deliberate way, showing no excitement at all, in a chair right near the deceased, and said to him, "I see you have done it." Deceased said to him, "The matter is in the hands of Charlie Stevens and Walshe, and go and see them about it." Appellant then complained of hard times and the difficulty in raising money. Deceased said to him again to go and see Stevens and Walshe, that the matter was out of his hands. Deceased then got up and started to walk toward his private office. He was in his shirt sleeves and had only the newspaper in his hand. In getting up out of the chair, just before walking away, the deceased said to appellant that the matter was in the hands of Stevens and Walshe, and that Leech had plenty of money to play the races but not to pay the rent. As he walked away from Leech, where they were both sitting, towards his private office, his back was to appellant. Walter, his son, was only a few feet away from them. As deceased walked away, the appellant shot at him with a pistol, apparently missing him, and immediately fired again and struck him in the back near the spine, the ball passing through the body, lodging in the skin in front of his breast. The bookkeeper immediately ran to the deceased and asked who did it or what was the matter. Walter, the son, immediately replied, "John Leech did it; John Leech did it." The bookkeeper caught the deceased as he was falling and held his head in his lap, doctors were gotten as soon as possible, other parties came in and the deceased died in a very few minutes afterwards. Immediately after the shooting appellant ran out of Kohlberg's store, ran down the street a little distance and then ran in behind some obstructions and into an old vacant

house. He remained there a short time, when a policeman, hunting for him, found him, to whom appellant surrendered without any resistance. Walter, the son, knew, as he expressed it, that eviction papers had been served on appellant and he supposed that he came to see deceased about that. He gave particular attention to what was done and said, and heard and saw it all. As deceased was getting up out of the chair, he made the last remark to appellant about his having money to play the races but not to pay the rent. There were no weapons of any kind in deceased's store. What has been detailed, as said between the parties at the time, was all that was said by either and both of them. Walter said nothing and did nothing, except to pay particular attention to what was done and said at the time. Neither he nor his father made any character of demonstration or attack on appellant.

It is unnecessary for us to recite the testimony of appellant or of his witnesses, other than to state that he claimed that when the notice of the termination of the lease, demand of possession of the premises and to vacate, etc., was served on him, he communicated this to his wife, when she informed him that deceased had for a long time wanted appellant's wife to get rid of him and indicated that he would take care of her, and in effect, would maintain her as his mistress, if she would get rid of appellant; that this incensed and outraged him and that he, at the time of the killing, went to see deceased about this as well as about his rent, etc.; that the deceased and his son, Walter, attempted to assault him at the time and that there were some indications that deceased, in some way, had some instrument or something in his hands or about his person, indicating that he would use it in the assault upon appellant; and that he shot and killed the deceased because of this in self-defense and because of the insult to his wife. The jury, as it had the right, did not believe any of the appellant's testimony or that of his witnesses on these subjects, but instead, believed the testimony of the State's witnesses and the State's theory of the killing.

The court gave a full and correct charge on murder in the first and second degree, manslaughter, adequate cause, self-defense, reasonable doubt as to the cause generally and reasonable doubt specially applicable to the various phases of murder in the first degree, murder in the second degree, manslaughter and self-defense, all in favor of appellant Every phase raised by the evidence in favor of appellant was properly and aptly submitted by the charge of the court in favor of appellant.

Appellant's first bill of exceptions is to the admission in evidence of the testimony of the witness, A. R. Coleman, as to the threat by appellant against the deceased, which bill states that said Coleman was allowed to testify over his objections "as to the fact, but not the contents of a conversation had with the deceased in February, 1907, something like three and one-half years prior to the homicide out of which

this case arose, as to threats made by appellant against Kohlberg in February, 1907, over the objections of appellant, on the ground that said conversation of said witness with said Leech at the time, was incompetent and immaterial, the said threat too remote to be competent or material in this case; said witness testifying over defendant's objections and exceptions, as follows: 'Mr. Stevens gave me a list of Mr. Kohlberg's back rents, and I went down to see Mr. Leech and told him I was representing Mr. Stevens, and presented the bill. He objected to it and we had considerable argument. The second trip down there, I went and presented the bill and told him that Mr. Kohlberg had ordered him to be vacated. To be put out if he didn't pay the rent, and Leech said, "If he does, I will kill the damned Jew;" this was in the latter part of 1907, as I recollect it.' "

It is elementary, and has been many times decided by this court, that threats by the accused against the deceased are always admissible as proof of express malice and motive. Frizzell v. State, 30 Texas Crim. App., 42; Howard v. State, 23 Texas Crim. App., 265; 21 Cyc., 890. And when the threat, although remote, tends to explain the main and the immediate cause of the killing, an objection to it is more to the weight than to its admissibility. Dill v. State, 1 Texas Crim. App., 278; Jones v. State, 4 Texas Crim. App., 436; Rucker v. State, 7 Texas Crim. App., 549; Russell v. State, 11 Texas Crim. App., 288; 6 Ency. Ev., 631; 21 Cyc., 892. Such threats even though made three years, or longer, prior to the killing for the same purpose and under the same circumstances, are clearly admissible. The jury is to pass upon the weight of such remote threats. Goodwin v. State, 96 Ind., 550; People v. Cronin, 34 Cal., 191; Everett v. Ga., 62 Ga., 65; Redd v. State, 68 Ala., 492; Keener v. State, 18 Ga., 194; State v. Ford, 3 Strob., 517; Peterson v. Toner, 80 Mich., 350; Territory v. Roberts, 9 Mont., 12; Babcock v. People, 13 Col., 515. Many other authorities, both elementary, and decisions by courts might be cited, but we deem it unnecessary.

On this particular point it will be noted from the statement of the evidence above, that from the State's theory and evidence, it was clearly established and believed by the jury, that every time the deceased began to press the appellant for the payment of the back rent, and gave him, through deceased's agents, notice of intended eviction, first in February or March, 1907, or as stated by this bill, "in the latter part of 1907," the appellant threatened that if deceased did evict him he would kill him. This threat was made first to Coleman as stated above. The second time to C. B. Stevens, deceased's agent, in April, 1909; again to the same witness and agent, Stevens, in April, 1910, and when actual proceedings preparatory to and beginning an eviction on June 17, 1910, were had, he literally carried out and put into execution, each of these threats, by, in effect, a cold blooded

assassination of the deceased for this particular cause. In our opinion, this testimony by Coleman was clearly admissible.

Appellant's next bills of exceptions are his complaint to the argument of Victor C. Moore, one of the prosecuting attorneys for the State, and the other, W. D. Howe, the other prosecuting attorney. These bills complain that when said Victor C. Moore, in his argument for the State, in discussing the character of the defendant, in substance and effect, said to the jury: "Good character amounts to nothing, any one can prove a good character. Virgil Gallagher, of Dallas, Texas, who murdered his mother and burned her body, proved a good character." To this argument counsel objected as being improper and calculated to prejudice the minds of the jury against the defendant and as not being based on any material evidence in the case. As to the argument of said Howe, appellant, in his bill, states that said Howe "stated to the jury that it was a matter of common knowledge that the jurors of the country were being criticised everywhere for not performing their duties, and for not convicting criminals, and that he hoped such criticism would not be made concerning the actions of this jury after this case would be disposed of." This was objected to by appellant as improper, and highly prejudicial to the rights of the appellant. Both of these bills, as claimed by the appellant, were contested by the State. The court, in allowing them, made this explanation: "That as soon as the court was able to detect the trend of counsel's remarks, the court, of his own motion, before objection, in a loud tone of indignation, interrupted the speaker, preventing him from completing the sentence; and that the said Victor C. Moore, as soon as he could realize that the court or counsel for defendant, was interposing an objection, desisted promptly; and that, as to the mention of Virgil Gallagher, the court immediately stated in an angry tone to the jury and to counsel, that the conduct of this speaker was a flagrant breach of duty and highly censurable, admonished and warned offending counsel not to repeat his offense, instructed and exhorted the jury not to consider what the speaker had said as to what may have occurred on other trials, that they must try this case on the evidence, and the testimony of witnesses sworn in the case, and that every juror, as well as counsel, knew that the State could not attack defendant's evidence of reputation by the remarks of counsel as to other trials or other defendants, which, under their oaths as jurors, they must not consider. And that after the mention by the said Victor C. Moore, of the instance of Virgil Gallagher, as set out in defendant's bill of exception No. 2, and before the said Moore had made further sense or enunciated anything intelligible, he was stopped by the court, who sternly refused him permission to apologize or explain or allude to the matter in any manner further, as is all shown in paragraph three of the State's answer to defendant's motion for new trial hereinbefore filed, and the supporting affidavits thereto, and

which statement and affidavits in behalf of the State, were not controverted by the defendant; and which said statements on oath are known to the court to be true, and that the court, before charging the jury, suggested to counsel for defendant that unless they preferred the omission thereof the court would, in his written charge to the jury, give an instruction on this and each and every irregularity committed by counsel for the State in their argument for the State against defendant, and would have done so but for the fact that counsel for defendant stated the defense did not desire such instructions." The controverting affidavits referred to by the court above, show that before Victor C. Moore had concluded the sentence in his argument complained of, and slightly before the appellant's attorneys began their objections, the court, of his own motion, in a loud tone of indignation, interrupted the speaker, prevented him from completing the sentence of saying sufficient to make the incident alluded to intelligible and that counsel for both sides and the court were, for the instant, speaking together, thus drowning his enunciation so that the jury could not understand anything that was being said and that counsel for the State desisted promptly without completing the sentence.

As to the bill with reference to the argument of Mr. Howe, the court qualified that as follows: "The district attorney, upon objection of defendant and his attorney, was promptly stopped in his argument, and the court thereupon and instantly stated to and in the hearing of the jury in open court: 'Mr. Howe (district attorney), that argument is improper and should not have been made by you, and gentlemen of the jury, you are instructed to disregard that argument; it was improper for any purpose, and the court charges you to exclude that argument from your consideration for any purpose whatever; your duty is to consider only the law and evidence, and under your oath, you can not consider public sentiment.' "

Ordinarily, where improper remarks have been made by a prosecuting officer in argument to the jury, there is no ground for reversal unless the defendant objects, takes a bill of exceptions, and asks a special charge in writing to disregard the remarks and the charge is refused. Carver v. State, 36 Texas Crim. Rep., 562; Monticue v. State, 40 Texas Crim. Rep., 531; Armstrong v. State, 34 Texas Crim. Rep., 348; King v. State, 32 Texas Crim. Rep., 463; Dudley v. State, 40 Texas Crim. Rep., 35; Bird v. State, 39 Texas Crim. Rep., 609; Lancaster v. State, 36 Texas Crim. Rep., 16; Levine v. State, 35 Texas Crim. Rep., 647; Renfro v. State, 42 Texas Crim. Rep., 407.

Again, if improper remarks are, by the court, withdrawn, and the jury instructed to disregard them, ordinarily the injury, if any, has been cured. See the cases last above cited and Love v. State, 35 Texas Crim. Rep., 27; Miller v. State, 27 Texas Crim. App., 63. Many other cases might be cited on both of these propositions, but we deem it unnecessary. In this particular matter the court shows by his qualifi-

cation of the bills that he offered to appellant's attorneys to give the jury a written charge in addition to what occurred at the time the remarks were made and objections urged, if they desired it, but that they stated they did not desire such charge. We take it that this shows clearly that in the opinion of appellant's attorneys at that time, the injury by these remarks, if any, had already been fully cured by what had been done and said by the parties and the court at the time. It is our opinion that no reversible error, even if any error at all, was committed.

The next objection urged by appellant is to the 8th subdivision of the main charge of the court. That charge is as follows: To warrant a conviction of murder in the first degree, the jury must be satisfied by the evidence, beyond a reasonable doubt, that the defendant, before the act, deliberately formed the design with a calm and sedate mind to kill deceased; that he selected and used the weapon or instrument reasonably sufficient to accomplish the death by the mode and manner of its use, and that the killing was unlawful. The act must not result from a mere sudden, rash and immediate design, springing from an inconsiderate impulse, passion or excitement, however unjustifiable and unwarrantable it may be." The only objection made thereto was that this charge was erroneous because it did not fully and correctly state the law as to the character and design formed to kill, that is, that same must be formed from malice aforethought and was too indefinite to be fully understood by the jury. This objection is too general. Besides this, it is elementary that the charge of the court is to be taken as a whole, and even if some slight error is made in any particular part, unless the whole shows material error, it is no cause for reversal. We have carefully examined the whole charge of the court and especially on this subject. Even admitting that this subdivision 8, of the charge of the court, is susceptible to criticism, which we do not concede; taking it as a whole, there is no question but that no error resulting in injury to the appellant by this charge occurred.

Complaint in a general way is made by the appellant that the court erred in other separate and distinct paragraphs of the charge and also erred in refusing to give several special charges requested by appellant. We have carefully examined all of these matters and what we have said above about the complaint as to paragraph No. 8, of the court's charge, equally applies to all the others. Taken as a whole, the charge of the court, in every way authorized by the law, submitted every issue, raised by the evidence in this case, properly to the jury. There is no such error, if any at all, in any of these matters complained of, that could or would authorize us to reverse this case. Even conceding that separate provisions of the charge might be subject to some criticism, article 723, Code Criminal Procedure, prohibits this court from reversing the judgment in this case, unless such error was

calculated to injure the rights of the defendant. In our opinion, no such injury has occurred.

The judgment is, therefore, in all things, affirmed.

*Affirmed.*

[Rehearing denied October 18, 1911.—Reporter.]