## J. O. Powdrill v. State.

### No. 1914. Decided June 19, 1912.

### Rehearing denied February 5, 1913.

**1.—Murder—Evidence—Former Difficulty—Motive.**

Upon trial of murder, there was no error in permitting the State to introduce testimony as to a former difficulty between the defendant and deceased occurring several years before the homicide, as to what was said and done during that difficulty, without giving the details thereof, but showing that defendant made an assault with a knife upon deceased and that the difficulty grew out of the separation of his parents and ending by defendant telling deceased, his son, to leave his house; and this, although a partial reconciliation had occurred sometime before the killing. Davidson, Presiding Judge, dissenting.

**2.—Same—Evidence—Threats—Motive—Reconciliation.**

Upon trial of murder, there was no error in admitting in evidence the threats of the defendant against the deceased made at different times, and this, although a partial reconciliation had occurred between defendant and deceased since these threats were made. Following Leech v. State, 63 Texas Crim. Rep., 339.

**3.—Same—Evidence—Papers in Civil Suit—Motive.**

Where, upon trial of murder, it developed that the homicide grew out of divorce and injunction proceedings which the wife of the defendant had instituted against him, and in which her son, the deceased, supported her, there was no error in admitting in evidence so much of the proceedings in the civil suit which explained the transaction without introducing the details thereof. Davidson, Presiding Judge, dissenting.

**4.—Same—Charge of Court—Manslaughter.**

Where, upon trial of murder, the evidence showed that the homicide grew out of certain divorce and injunction proceedings instituted by the wife of the defendant against him, and in which deceased assisted her; that defendant had made different threats at different times on account of this against the

deceased, threatening to kill him if he continued meddling with his affairs, and that he finally did kill him for this reason, and there was no evidence which tended to show sudden passion or adequate cause, there was no error in the court's failure to charge on manslaughter. Davidson, Presiding Judge, dissenting. Following Redman v. State, 52 Texas Crim. Rep., 591.

**5.—Same—Charge of Court—Self-defense—Manslaughter.**

It is the well established law of this State that where the case presents either murder or perfect self-defense, there is no error in the court's failure to charge on manslaughter; besides, in the instant case, there was no evidence of self-defense. Following Treadway v. State, 65 Texas Crim. Rep., 208.

**6.—Same—Former Decision—Practice on Appeal—Manslaughter.**

Where, upon a former appeal, this court did not pass upon the question of manslaughter, but the case was reversed upon another ground, and the court merely called attention to the question of manslaughter, the instant case cannot be controlled by that opinion; besides, the court charged upon manslaughter in the instant case on the only possible theory suggested by the evidence, and there was no error.

**7.—Same—Charge of Court—Res Gestae Statements.**

Where, upon trial of murder, the res gestae statement of defendant that he had to kill deceased because he came at him with a knife was not an admission or confession by him, and was part of the res gestae of the transaction; and besides, the State introduced other evidence upon which to base a conviction of murder, all of which was submitted under a proper charge of the court, there was no error in the court's failure to instruct the jury that they could not convict defendant because of his res gestae statement, unless they found the same untrue beyond a reasonable doubt. Davidson, Presiding Judge, dissenting. Following Slade v. State, 29 Texas Crim. App., 381, and other cases.

**8.—Same—Charge of Court—Murder—Cooling Time—Limiting Evidence.**

Where, upon trial of murder, the court, according to the facts, submitted the different degrees of murder and cooling time and properly limited the testimony with reference to a former difficulty, there was no error.

**9.—Same—Charge of Court—Explanation.**

Where, upon trial of murder, the evidence raised circumstantially the question that defendant approached deceased for an explanation of certain troubles between them, the court properly submitted a charge thereon; besides, this was in favor of defendant, and he could not complain.

**10.—Same—Charge of Court—Requested Charge—Art. 743, C. C. P.**

Where, upon trial of murder, the charge of the court properly embraced every matter raised by the evidence, and there were no errors of omission or commission in the charge which could result in injury to defendant, there was no error on this ground, under Article 743, Code Crim. Proc.

Appeal from the District Court of Rusk. Tried below before the Hon. W. C. Buford.

Appeal from a conviction of murder in the first degree; penalty, imprisonment in the penitentiary for life.

The opinion states the case.

*D. M. Short & Sons,* for appellant.—On question of reconciliation between parties: State v. Horn, 116 N. C., 1037; People v. Hyndman, 99 Cal., 1; State v. Barnwell, 80 N. C., 466; Clark v. State, 56 Am. Rep., 45; People v. Colvin, 50 Pac. Rep., 539; People v. Thomson, 28 Pac. Rep., 589.

On question of want of malice: Dixon v. State, 51 Texas Crim. Rep., 555; Farrer v. State, 42 Texas, 265.

On question of introducing papers in civil suit: Pinckford v. State, 13 Texas Crim. App., 468; Binns v. State, 26 Am. Rep., 48; People v. Conklin, 67 N. E. Rep., 624; Moody v. State, 24 Texas Crim. App., 458; Draper v. State, 22 Texas, 401; Long v. State, 17 Tex. Crim. App., 128; Hardin v. State, 40 Texas Crim. Rep., 208; Abrams v. State, 40 S. W. Rep., 798.

On question of court's charge on manslaughter: Snowberger v. State, 58 Texas Crim. Rep., 530; Brown v. State, 54 id, 121; Keith v. State, 50 id. 63; Grant v. State, 55 id. 284.

On question of cooling time: Dixon v. State, 51 Texas Crim. Rep., 555; Rice v. State, 51 id, 255; Cooper v. State, 49 id, 28; Manning v. State, 48 id., 55; Mayhew v. State, 65 Tex. Crim. Rep., 290, 144 S. W. Rep., 229; McCoy v. State, 25 Texas, 33; Watson v. State, 50 Texas Crim. Rep., 171.

On question of res gestae statements of defendant: Winkler v. State, 58 Texas Crim. Rep., 564; Gibson v. State, 53 id, 349; Combs v. State, 52 id, 613; Pratt v. State, 50 id, 231; Monroe v. State, 47 id. 63; Caselton v. State, 57 id. 436.

*C. E. Lane*, Assistant Attorney-General, and *Blount & Strong*, for the State.—On question of former difficulty: Howard v. State, 25 Texas Crim. App., 686; Anderson v. State, 15 id, 447; Mathir v. State, 34 Texas Crim. Rep., 39.

On question of divorce and injunction proceedings: Powdrill v. State, 62 Texas Crim. Rep., 442; Turner v. State, 33 id, 103.

PRENDERGAST, JUDGE.—On August 4, 1910, appellant was duly indicted by the grand jury of Shelby County for the murder of his son, Oscar Powdrill, on June 23, 1910. There was a trial of the cause had first in Shelby County at which the appellant was convicted of murder in the first degree. On appeal to this court the cause was reversed. The opinion is reported in 62 Tex. Crim. Rep., 442, 138 S. W. Rep., 114. Thereafter the venue of the case was properly changed from Shelby to Rusk County and a second trial had in January, 1912, when the appellant was again convicted of murder in the first degree and his penalty fixed at life imprisonment.

On the first trial appellant testified in his own behalf. On the last he did not. Some of the witnesses who testified on the first trial did not testify on the second; while some who did not testify on the first, testified on the second trial.

It is unnecessary to make an extended statement of the evidence. There was very little if any conflict in the evidence. In order to bring out and decide the questions raised, we will make a brief, but substantial statement of the evidence.

In November, 1907, some trouble arose between appellant and his wife which resulted at that time in their separation, she leaving or

being forced to leave their home. They had then been married many years and had several children, some of whom were then grown. Among them was Oscar, their son, the deceased. Oscar had been away from home some time. About November 4, 1907, he returned home and found that his mother and father had separated and that his mother was away from the home. His father would not let her come back. When Oscar reached home that night, finding his mother gone, he spoke to his father and said: "What does this mean?" His father, appellant. replied, "I do not know that that is any of your damn business." His father then attempted to get a gun to shoot his son Oscar, but was prevented by some one present from doing so. He then assaulted Oscar, kicked him, got out his knife and cut him and ordered him to leave home. Oscar did so. When Oscar was then leaving, appellant told him if he caught him monkeying with his business any more he would kill him. The next morning appellant also told Bud McKenzie, who was talking with him about what had occurred between him and Oscar, the night before, that he "liked to have killed Oscar," the night before, and if he came there cutting up again he would kill him. About the same time he also told Frank Patterson that if Oscar did not quit meddling with his business he would kill him. The morning after appellant's assault on Oscar, he told his son Bob that if Oscar ever meddled with his business any more, he was going to kill him.

Either the last of April or first of May, 1910, appellant was in the office of Mr. Sanders, an attorney in Center, talking to Mr. Sanders about his, appellant's, family and domestic matters and trouble and about Oscar's taking up for his mother and in that conversation he said to Mr. Sanders, "Oscar is taking up for his mother and prying into my domestic affairs, and if he keeps it up I am going to kill him." A short time before the killing and the Monday when appellant met his wife and son investigating his sale of some hogs and when appellant was returning from, or going to Athens, he met S. M. Adams; they had been acquainted for many years; after they talked a while Adams asked him how he was getting along and he replied that he was not getting along much; that the world had gone against him and when asked what was the trouble, and when told by Mr. Adams if he would leave it to Mrs. Powdrill and go back and do what she said that things would blow over, and after discussing the matter further, as the witness expressed it, one word brought on another and appellant said, "If things don't change Hell will be to pay."

When this said assault and cutting of Oscar occurred appellant's wife had either then sued him or did sue him for a divorce, praying for an injunction against him. Soon after this a reconciliation occurred between appellant and his wife. That suit for divorce was then abandoned, she returning to her home and they continued to live together until January, 1910.

In January, 1910, trouble again arose between appellant and his wife and on February 13, 1910, she again sued him for a divorce and prayed for an injunction on which was granted by the Judge of the District Court of Shelby County in the divorce suit. So much only of this divorce and injunction proceedings was introduced as to show that appellant and his wife were married in September, 1880 and that they continued to live together until January 19, 1910; that during their marriage they accumulated both real and personal property and among other things about 100 head of hogs. She prayed that appellant be required to return an inventory and appraisement under oath of all their property; that she be allowed to remain in possession of their homestead and other personal property and that a writ of injunction issue restraining him from interfering with her possession of the same, or coming about plaintiff or said premises, or molesting her in any way, and restraining him from disposing of any of said property or contracting any debts on account thereof until the further order of the court; that the court granted her prayer and upon her entering into bond required him to return said inventory and enjoined him from selling or otherwise disposing of or wasting any of said property or incurring any debts or liability that would incumber the same; that that divorce cause would be heard on the first Monday in August at the August term of said court. The appellant was at once duly served with proper citation and the said writ of injunction. So much of the injunction bond was introduced as to show who the sureties were, one of them was Oscar, the deceased.

Notwithstanding this injunction and the appellant's notice and knowledge thereof, some ten days to two weeks before the killing, he removed from the home place and sold and delivered several head of these hogs and received pay therefor. A few days after this sale his wife and Oscar were informed of it. On Monday morning, June 20, preceding the killing the following Thursday, June 23rd, appellant was fully informed that his wife and son Oscar were investigating his sale of these hogs and in fact, they met him at the home of his niece to whom he had sold the hogs and he then knew that his wife and son were proceeding to Center, the county seat, to lay the matter before their attorney for the purpose of proceeding against him to have him punished for selling said hogs in violation of said injunction. Just after this meeting with his wife and son, he left the home of his niece and went near to his own home to Mrs. Sanford's, where he was boarding and on this same day, Monday preceding the killing Thursday, he told Mrs. Sanford that his wife and son had been up to his niece's investigating his sale of the hogs to her and further said to Mrs. Sanford that they were fixing to put him in jail about it; that he had found that out and that Oscar was to blame with it and the one most in the business and he asked her, "Why does he not stay at home and attend to his own business and

let my business alone?'' And further said, ''Well, I am going to put a stop to it right now.''

It was further shown that Oscar and his mother, after meeting appellant at appellant's niece's, went on to Center, saw their attorney, discussed with him about apellant having taken and sold said hogs and their attorney agreed to prepare and did prepare and send to them the next day an affidavit for Mrs. Powdrill to make proceeding against appellant for violating the said injunction in the sale and disposition of said hogs. The notary in the neighborhood lived about one mile north of the Powdrill place and was in the mercantile business there also. Just after noon on Thursday, June 23, 1910, the day of the killing, appellant passed his home going to this notary's store, walking and carrying a gun. Some of his children saw appellant pass the house going towards this store and notary. Shortly after this, Oscar, who lived some few miles distant, drove to his mother's home in a buggy, accompanied by his wife and baby. His wife and baby at once got out of the buggy and Mrs. Powdrill and her són Oscar got in it and drove from there to said notary's store. They were accompanied by another son of appellant riding horse-back. Before they reached this store and notary, they passed appellant going in the same direction. No conversation is shown to have occurred between any of them, except between appellant and his younger son riding horse-back. The mother and two sons, upon reaching the store and notary, produced the affidavit which Mrs. Powdrill signed and swore to before the notary whose name is J. C. Walker. This affidavit was introduced in evidence and after reciting the granting of the injunction in the divorce proceeding prohibiting him from selling any of the property belonging to plaintiff and defendant and that he was duly served therewith, stated that he failed to obey the injunction, but on June 15, 1910, sold and disposed of thirteen head of the hogs belonging to them in violation of said writ. Just after Mrs. Powdrill and the notary had concluded this business, Mrs. Powdrill and her sons left his store, going across the street to another store in the little town called Arcadia and just as they went out of his store, appellant came into it. Mrs. Powdrill had left this affidavit with the notary with instructions for him to mail it to her attorney at Center and he agreed to do so. When appellant walked into the store of the notary he had his double-barrel shotgun with him and said to the notary he wanted to see him as soon as he got through, he then being engaged in waiting on a customer. In three or four minutes the notary finished and appellant met him in the back part of his store and wanted to know what his wife and sons were there for. The witness tried to avoid telling him, but by the appellant insisting and asking him if they were not fixing up some papers about some hogs the witness told him that was their business. Appellant then asked witness to write a letter for him to his, appellant's, attorney at Center. The witness insisted upon the appellant going to see his attorney, but

he claimed that he had made an engagement to take some children to a masonic dinner the next day. Appellant then asked the witness for loaded shells and wanted those loaded with the largest shot he had and then purchased from the witness a box of the largest shells he had. Mrs. Powdrill and her sons had then left Arcadia returning to her home. As soon as appellant bought the box of loaded sheels from the witness, he did not wait to go out the front door,—the way he had come,—but jumped out of a side door, without steps, some four feet from the ground. This witness Walker further testified that upon appellant insisting upon knowing what his wife and sons had done, he told him they were there fixing up some papers against him charging him with selling some hogs and violating the injunction. In talking to the witness at this time, appellant's voice trembled and he seemed to be mad and vexed during all that time; he seemed to be very much bothered and his face was red.

On his way to Arcadia, when his wife and two sons passed him, he stopped at the house of his niece, just long enough to exchange guns; he stopped at the same place returning from Arcadia just long enough to tell his niece that he had to go to Center to see his counsel that evening and that he would get back late at night and to fix a bed for him; she had only a few words with him, did not notice anything wrong with him then and noticed nothing out of the ordinary. He left her house going towards Mrs. Powdrill's taking a gun with him. In a few minutes thereafter he appeared at his home. His wife and some of his daughters and his other children were on the gallery in the front of the house. Appellant was walking fast; he came up in front of the gate where his wife and daughters were and asked if the hogs were bothering them; one of his daughters replied "no, sir." He then said, "I allowed they were; I heard you all dogging them; I will get the rest of them up and sell them as you have been accusing me of selling them." All this time he was walking, but not fast. Several of his daughters, who saw and heard this testified that he seemed to be mad. They could tell it from his actions and what he said.

Upon leaving Arcadia Mrs. Powdrill and her two sons went directly back to her home. Oscar at once took his horse out from the buggy, put the plow harness on him, picked up a plow and a hammer, put the plow on his shoulder and led his horse on down through the farm and some gates to his field of corn for the purpose of plowing. It was in a very few minutes after this that appellant appeared on the scene. His daughters testified that they could always tell when he was mad; that when he was, he cleared his throat in a certain way and walked and went in a hurry, went fast when he went anywhere. When he first reached the house he proceeded around the corner of it like he was going to the barn and lot apparently then looking for his son Oscar. Not seeing him, because his son had just immediately before gone on to the field, he proceeded in that direction rapidly.

In a very few minutes all of his children heard two gun shots fired in rapid succession. Two of his sons were working in a field only a very short distance from where Oscar was then killed. Trees, a plum thicket and other things, obstructed the view of these two sons and of his daughters at his house so that, although the distance from them respectively to Oscar was short, none of them could see either Oscar or appellant at the time Oscar was killed. Immediately after the two gun shots were fired all of his children hurriedly went to where Oscar was. Just before reaching him they met their father returning from where Oscar was found and one of his sons said to him, "Well, you have killed him at last." He replied, "I have killed him, but he ran on to me with his knife and you can come and kill me if you want to," and thereupon threw down his gun, they thinking at first that he was going to assault them, but instead he offered the gun to them. They told him that they did not want to harm him and for him to go on, which he did. They immediately proceeded to where Oscar was and found him dead. One gun shot had struck his left arm almost severing it from his body and some of the shot evidently from that fire of the gun had also glanced the fingers of Oscar's right hand. The other shot struck Oscar just under the left arm-pit and went entirely through his body, coming out on the opposite side just below the right arm-pit. Without detailing the evidence as to the immediate surroundings, the physical facts authorized the jury to believe that appellant killed his son without his son knowing anything about it. In fact, waylaid and assassinated him. It seems that while some of the witnesses endeavored to track appellant from the house where he had had the little conversation with his children to where he stood at the time of the killing, they could not track him. However, they did clearly track him away from there. As we understand the record and the evidence, the tracks indicated that appellant was several steps away from the deceased at the time he killed him. They were not in or about the path or trail close to the fence where the deceased had his horse and carried his plow and hammer. Deceased's large pocket-knife was found a few steps away from where his body was found covered up in the sand. Just under the body was found a freshly cut twig which was fitted to and shown to have been cut from a twig near where the body was found. The physical facts and the evidence clearly satisfies us, and the jury found that deceased did not attack appellant with his knife and that the appellant did not kill him in self-defense.

The evidence shows that, after appellant assaulted, attempted to get his gun to shoot Oscar and kicked and cut him in November, 1907, that they afterwards became friendly. The testimony does not reveal that there was any specific reconciliation between them but it does show that the deceased perhaps stayed at his father's some months after the reconciliation between appellant and his wife but that shortly afterwards the deceased married and did not thereafter

live with his father and mother. His father, in the early part of 1910, let his son Oscar have some land on his farm to raise a crop which he was doing at the time he was killed and that from time to time his father let his son have his, the father's, wagon to haul. The evidence does not disclose that they were at all any time afterwards cordial with one another. It, however, does not show any further breach between them until the second separation between appellant and his wife. All this was before the jury.

When the State offered proof by appellant's son and daughters of the difficulty between appellant and his son Oscar in November, 1907, at the time shown by the statement above when appellant assaulted, kicked and cut his son, the witness was asked what the occurrence was and what caused it. The appellant objected that the question called for a conclusion of the witness and stated that the witness could state what occurred and that it was all right. The court then directed the witness to tell what he saw and heard at that time. Then the appellant objected to the details of the difficulty. The witness was then permitted to state merely and briefly what was said and done then to the effect that when the son came home and found his mother gone, he asked his father what that meant and his father replied that it was none of his (deceased's) damn business, and then tried to assault him with the gun, but was prevented and thereupon kicked his son Oscar, cut him with a knife, and ordered him off the premises and the son at once left. The court did not permit the details of this difficulty to be gone into. This testimony was clearly admissible to show the hostility entertained by appellant for his son.

Appellant also objected to the State proving the several threats made by appellant against deceased shown above in the statement of the evidence. This was objected to on many grounds,—among them, that a reconciliation had afterwards occurred between them, between the time these threats were made and the killing and that the threats were too remote to be introduced in this case.

We had occasion recently in the case of Leech v. State, 63 Texas Crim. Rep., 339, 139 S. W. 1147, to investigate and pass on this question. Some of the authorities are cited in that opinion. Clearly all of this evidence was admissible.

Appellant also objected to the introduction of the proof about the original suit for divorce in November, 1907, and that of February, 1910, and the affidavit made by appellant's wife charging him with the violation of the injunction and proceeding thereby against him to have him punished for violating the injunction. It is unnecessary to recite these matters in full or the various objections made thereto. Only so much of these proceedings were introduced as were pertinent to show that the divorce proceedings had been begun; that appellant had been properly enjoined from disposing of any of the property, including the hogs specifically, and the affidavit of Mrs. Powdrill

to the effect that he had disposed of these hogs in violation of the injunction and thereby beginning proceedings against him to punish him for contempt for violating the injunction. None of the recitations other than to show these facts were permitted to be introduced by the court on the trial and only so much as was clearly shown to be permissible under the previous decisions of this case was admitted. There was no error in this.

One of appellant's main complaints is to the charge of the court on manslaughter; among other things, that cooling time in connection therewith was not charged and many other complaints thereabout. We have thoroughly considered this matter and the evidence in this case and in our opinion the evidence in no way called for a charge on manslaughter. The evidence neither shows, nor tends to show sudden passion, nor adequate cause, both of which are absolutely essential to require a charge on manslaughter. Every fact and circumstance in the case, shown by the proof and without controversy at that, shows that in November, 1907, when appellant had a disagreement with his wife and it seems drove her away from home and would not permit her to return, when his son reached home after an absence and merely asked what it meant, his father resented his inquiry, attempted then to shoot him and did actually commit an assault and battery upon him by kicking him, cutting him and ordering him from his place, and then told him that if he caught him monkeying with his business any more he would kill him. The next morning he told his son Bob that if ever Oscar meddled with his business any more he was going to kill him. On that same day he told Frank Patterson that if Oscar did not quit meddling with his business he would kill him and on the morning after he had assaulted Oscar, as stated above, he told Bud McKenzie that he "like to have killed Oscar" the night before and if he came there cutting up any more he would kill him. About the last of April or first of May, 1910, he told Mr. Sanders that Oscar was taking up for his mother in his, appellant's, domestic matters and trouble with his wife and that Oscar was taking up for his mother and prying into his domestic affairs and if he kept it up he was going to kill him. Some two weeks before he did kill his son, he told Mr. Adams about his trouble with his wife and that if things didn't change hell would be to pay. On Monday before he killed his son on the following Thursday afternoon he knew that his wife and son were investigating the sale by him, in violation of the injunction, of said hogs, and that Oscar was assisting his mother in the investigation and proceeding against him at that time. He saw his son and his wife on that occasion and knew what they were doing. He then went to where he was boarding and on the same day told Mrs. Sanford with whom he boarded, that his wife and son Oscar were fixing to put him in jail because of his having sold said hogs, and he then said to her in substance that Oscar had a wife and child and business of his own to attend to and re-

marked, ''Why don't he stay at home and attend to his own business'' and let his (appellant's) business alone, and that he was ''going to put a stop to it right now.'' He seems to have kept up with the matter fully and followed his wife and son to Arcadia where they made the affidavit against him, and demanded of the notary if they had not proceeded against him, and when informed that they were proceeding against him because of the violation of the injunction and selling the hogs, he was mad, then had a gun with him, procured ammunition, left hurriedly, and hastened on, hunting for and trailing down his son and in a few minutes after he was informed by the notary that his wife and son had been there and prepared the affidavit against him, proceeded, as we believe, to waylay and assassinate his son, showing a hostility to his son and threats continued from November, 1907, till the evening of June 23, 1910, and then killed him for the very reason that he had threatened to kill him from November, 1907, continuously up to the very time of the killing. That express malice instead of sudden passion is thus established, and sudden passion is positively disproved.

There was no adequate cause. The son had the perfect right,— and as between the father and mother, as shown by this record, it was his duty,—to aid her in the investigation of the appellant's wilful violation of the injunction against him and the appellant, having wilfully violated the injunction, the proceeding against him therefor, even if it had been by his son alone and not by the son merely aiding and assisting his mother, could be and under no circumstances would have been adequate cause. Redman v. State, 52 Texas Crim. Rep., 591.

Appellant contends that he killed his son in perfect self-defense. As stated above, upon a consideration of all the facts and the physical facts, it is our opinion that this was unquestionably and beyond doubt clearly disproved. But upon his theory and claim, it is the well established law of this State that where the case presents either murder or perfect self-defense, it is not error to fail to charge on manslaughter. Some of the decisions on this point are collated and cited in Treadway v. State, 65 Texas Crim. Rep., 208, 144 S. W. Rep., 655. It is needless to cite or comment upon them herein.

In the former decision of this case we did not pass upon, nor were we called upon to pass upon, the question of whether or not a charge on manslaughter was called for at that time as the record was then presented to us. The case was reversed upon another ground and as appellant was complaining of some feature of the charge on manslaughter and not knowing what the evidence would be upon another trial, in the opinion on the former appeal we merely called attention to the fact that a complaint was made to the charge on manslaughter because it did not submit affirmatively, instead of negatively only, such question and we said therein: ''This criticism may be correct and the court on another trial can so charge as that this criticism can

not be correctly made.'' With reference to the complaint on the former appeal that the court ought to have charged on cooling time with reference to manslaughter, we merely said: ''These matters can be properly charged, if the evidence raises them, on another trial of this case.'' Besides this the court gave a charge on manslaughter in appellant's .favor on the only possible theory suggested by the evidence.

Among other complaints by appellant of the charge of the court in this case is, that because the State introduced appellant's res gestae statement to his children immediately after he had killed his son Oscar that he ''had killed deceased but that deceased was coming on him with a knife,'' that the court should thereupon have instructed the jury that they could not convict appellant because of the proof of this res gestae statement, unless they found said statement to be untrue beyond a reasonable doubt, and cites Pharr v. State, 7 Texas Crim. App., 472, to sustain this contention. The State in reply to this contention of appellant, claims that the court did not so err, because the res gestae statement was not an admission or confession by appellant, but was a part of the res gestae of the transaction and because the State had ample and sufficient evidence other than this res gestae statement upon which to base a conviction, and that as the court had fully submitted the question of appellant's guilt of murder in the first and second degree and required that before they could convict him of either of these degrees of murder that they must find him guilty beyond a reasonable doubt, and that if the appellant wanted any further charge on the subject it was incumbent upon him to request it. A careful consideration of the charge in this case convinces us that as the case was submitted it clearly required the jury to believe,—not in express terms,—but clearly in effect, that they must believe beyond a reasonable doubt that appellant did not kill the deceased in self-defense but with express malice aforethought, and thereby covered everything on this point that could have been required. Besides, we believe that the State's contention in reply to appellant on this point is correct. Slade v. State, 29 Texas App., 381, 16 S. W. Rep., 257; Jones v. State, 29 Texas Crim. App., 20; Trevenio v. State, 48 Texas Crim. Rep., 207, 87 S. W. Rep., 1162; McKinney v. State, 49 Texas Crim. Rep., 591, 88 S. W. Rep., 1012; Tidwell v. State, 47 S. W. Rep., 466.

The court in the charges on murder in the first and second degrees sufficiently and clearly charges on cooling time, a sedate mind, etc., so as to clearly present these two degrees of murder. It was altogether proper for the court to limit the purpose as it did for which the jury could consider the divorce proceedings before them and the first difficulty between appellant and his son in November, 1907.

Neither did the court err in submitting to the jury for their finding whether or not appellant approached deceased to discuss with him at the time of the killing his family troubles and the contempt pro-

ceedings against him for violating the injunction. While there was no direct evidence on this point, the evidence did by circumstances evidence some such questions so that the court's charge thereon was not reversible error. Besides, it was all clearly in appellant's favor and not against him, so that he could not have been injured thereby.

Appellant has many complaints of what he claims are omissions in the charge of the court, as, for instance, on various phases of cooling time and not submitting a specific requirement in the court's charge that the State must disprove appellant's res gestae statement that he killed deceased because he was coming on him with his knife and that, as a reconciliation between father and son had occurred after their difficulty in November, 1907, and appellant's belief about his son's siding with his mother in the divorce suit and in her attempt to have him punished for violating the injunction and such like matters. We have considered all these matters and none of them present any error. The appellant requested no charge on any subject. Upon a careful and thorough consideration of the charge of the court, it is our opinion that it embraces properly every matter that is raised by the evidence and that there is no omission therein that in any way resulted to the injury of the appellant. It is true as contended by appellant that Article 735 (715) Code Criminal Procedure requires the court to distinctly set forth all the law applicable to a case. Yet, Article 743 (723) Code Criminal Procedure was amended so as to prevent this court from reversing a case even though all the law had not been set forth as called for by Article 715, "unless the error appearing from the record was calculated to injure the rights of the defendant." In our opinion no such error of either omission or commission, as would authorize this court to reverse this case, appears.

The judgment is, therefore, affirmed.

*Affirmed.*

[Rehearing denied February 5, 1913.—Reporter.]

DAVIDSON, Presiding Judge (dissenting).—I did not participate in the decision in the case when it was originally handed down, not being present. I was present, however, when the motion for rehearing was overruled. That I may not be regarded as consenting to the affirmance of the case and the manner in which it was affirmed, I will make a few observations by way of dissent.

The case shows clearly, as found in the transcript of the evidence, that in 1907, appellant's wife sued him for a divorce. The deceased, the eldest son of appellant, took an active part with his mother against the appellant in that matter. That suit was brought in 1907, but was dismissed. A reconciliation occurred between the parties and continued until 1910, when another suit for divorce with injunction proceedings was filed by the wife against appellant. Appellant about two years before the homicide had some trouble with the deceased but subsequently a reconciliation occurred between the father and his

deceased son. I cannot agree with my brethren that the reconciliation did not occur for the State's evidence and all the evidence shows clearly that it did. The facts show that some time before the killing, appellant gave his son, deceased, a horse, saddle and bridle when the latter was leaving home, going out in the western part of the State on some character of mission. Deceased was gone awhile, returning to his father's home, having disposed of the horse, saddle and bridle, and without anything. In other words, he was in a poverty stricken condition and began work on the railroad. During this time he was living with his father and mother and worked on the railroad until he was married about two years before he was killed. He then lived with his uncle, R. H. Powdrill, a short while when his father placed him on a farm, free of rent, and aided him in the cultivation of said farm, loaning him his wagon and team. Deceased continued to live on this farm, free of rent, until he was killed. He also worked a portion of his father's farm, free of rent, and was working that portion of his father's farm when he was killed. In January or February before the homicide appellant employed an attorney, Hon. S. H. Sanders, to defend the deceased in a case pending in court against the deceased and paid the lawyer his fee for defending his son. A daughter of the deceased, used by the State, testified: "My father rented the cotton ground to Oscar before the separation and gave him permission to plant a cane patch free of rent." The separation here spoken of was the last separation before the homicide. Bob Powdrill, a brother of the deceased and son of appellant, testified in this connection: "On Tuesday night after my father had come back from Henderson County on Monday, he and Jim and I and others started out on a serenading expedition, but after going a part of the way, we turned back and did not go and we all came back together as far as the road opposite our house and there we parted. My father went towards Mrs. Janes, and Jim and I went home. I did not tell my father what we had done at Center and what we intended to do. On the occasion of the serenade my father laughed and joked with us and was pleasant towards us and when we passed him on the road when we went to Arcadia he joked about some stirrup leathers. When my father came into the store at Arcadia he was apparently in as good humor as he was when he asked me about the stirrup leathers. I could not tell any difference." It was at Arcadia only a short time, within an hour or such a matter of the homicide, that appellant ascertained the fact of the contempt proceedings and that this conversation occurred between Bob Powdrill and his father, the appellant. Mrs. Bishop, daughter of appellant, testified: "When Oscar was first married he lived at Uncle Dick Powdrill's and afterwards went on the place my father had charge of. My father put him on that place free of rent. I have seen my father up there helping Oscar at work, cleaning up. That is to say, I have heard him say that he was going up there to help

Vol. LXIX Crim.—23.

Oscar. My father had a good wagon and team and Oscar did not have any, and I have seen Oscar use my father's wagon and team. I do not remember anything about my father helping Oscar out of his trouble with old man McCray. Oscar had been married about two years when he was killed." Attorney Sanders, testified: "I had represented Oscar Powdrill at Mr. Powdrill's request in some matters he had in court and Mr. Powdrill paid me the fee for representing Oscar. When I represented Oscar at the instance of Mr. Powdrill, for which Mr. Powdrill paid me the fee, this was some time in January or February, 1910, before he made the statement to me in April or May." Mrs. Ella Harris also testified to the same effect as the other witnesses, showing an entire reconciliation between the parties.

I do not care to go into details but I make the above statement as coming from the record which shows there had been a reconciliation between the parties. It is also manifest from the record, not only that there had been a reconciliation, but that up to within a very short time, perhaps within sixty minutes, or even a short space of time, that appellant was in a laughing, joking, humorous condition of mind and had not anticipated the serious results that followed so shortly. Upon ascertaining the fact that his wife and deceased had made affidavits for contempt proceedings against him, appellant became angered and outraged. His wife and the deceased had returned home, a short distance away. Appellant got his gun and went to the field where deceased was, and the killing occurred. Some of his children ran down to the field close by where they were living and met their father. This was within five minutes after the homicide, and remarked to him, "You have killed Oscar." He said, "Yes, I had it to do" as Oscar was coming upon him with a knife for the purpose of killing him. The ground was investigated at the scene of the killing and a very large knife was found near the body. This is uncontradicted testimony.

1. All of the proceedings in court were introduced in evidence by the State, over objections of appellant. This included the petition for divorce, injunction, affidavit, etc. I do not care to make a further detailed statement. The record is voluminous and it could serve no useful purpose as to what I may have to say. From the above, under the authorities in this State, I am of the opinion that the prior troubles had been two or three years before the homicide and which had all subsided and about which the parties were all reconciled, should not have gone before the jury. But if I am incorrect on that proposition, then unquestionably the law would require that the court limit the consideration of the jury to the latter provocation to the exclusion of the first. This has been decided as late as the case of Mayhew v. State, 65 Texas Crim. Rep., 290, 144 S. W. Rep., 229. See also McCoy v. State, 25 Texas 33. There ought to be no controversy on this proposition.

2. It may have been proper to introduce before the jury the fact

that the later divorce proceedings were pending in court and the deceased was instigating his mother to do what she was doing in that connection as bearing upon the question of motive. It seems that appellant grew enraged on account of the affidavit that the mother had made at the instigation of deceased for the contempt proceedings, and in a very short time committed the homicide, but the details and pleadings and averments of all those proceedings were not admissible, in my opinion.

3. It is clearly shown that the homicide grew out of making the affidavit for contempt proceedings within an hour of the homicide. This required the court to limit the jury in their consideration of the law and the facts in connection with that, without reference to the former trouble, which occurred about three years previously. And in this connection I would say, both on the facts and the law, appellant's conviction could not have been for a higher offense than murder in the second degree from the State's standpoint. It is the universal rule that where the purpose to kill is formed in an inflamed and excited condition of mind the offense is no higher than murder in the second degree, if the design is executed before the mind becomes sedate. Where a sufficient time has not elapsed for the mind to cool, the homicide would be no higher than murder in the second degree. The authorities are without any exception on this point. There have been quite a number of recent cases on this proposition of law, sustaining it, as I have stated. The court, therefore, should have limited the consideration of the jury, so far as murder is concerned, to murder in the second degree and the facts, in my judgment, do not sustain from the State's standpoint, a higher offense than murder in the second degree.

4. When the State introduced in evidence the declaration of appellant that he had shot his son in self-defense, as shown by the State's witnesses, it was incumbent upon the State to prove that statement false in order to secure a conviction of any grade of culpable homicide. This phase of the law should have been distinctly charged to the jury. Pharr v. State, 7 Texas Crim. App., 472; Combs v. State, 52 Texas Crim. Rep., 613; Pratt v. State, 53 Texas Crim. Rep., 281; Winkler v. State, 58 Texas Crim. Rep., 564.

There are many other questions in the case, suggested for reversal, of more or less merit. I have briefly stated these propositions without amplifying them. To cover all the questions it would take a voluminous opinion and would serve no practical purpose, so far as this case is concerned, inasmuch as the motion for rehearing has been overruled, and the case made a finality. I have briefly written what I have written in order to suggest that I cannot agree with the opinion which, in my judgment, practically overrules a great number of decisions without even discussing them, and this on several questions. This conviction, under this record, ought not to be affirmed.